**UNITED STATES of America, Appellee,**

v.

**Anthony D. DANIELE, Appellant.**

No. 88–2384.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1989.

Decided Oct. 4, 1989.

---

Donald L. Wolff, St. Louis, Mo., for appellant.

Michael W. Reap, Asst. U.S. Atty., St. Louis, Mo., for appellee.

* The Honorable EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Police Pension Fund was financed through a 7% contribution from all commissioned police officers and a contribution from the City of St. Louis. The fund benefits officers who are retired or on disability, as well as the widows and dependents of police officers. In October, 1982, the fund was valued at approximately $195 million dollars.

Before LAY, Chief Judge, BOWMAN, Circuit Judge, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

A jury found defendant Anthony D. Daniele guilty of ten counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342 (Counts 7–16), one count of conspiracy in violation of 18 U.S.C. § 371 (Count 17), and four counts of extortion or attempted extortion in violation of 18 U.S.C. §§ 1951 and 1952 (Counts 18–21) in connection with a scheme to direct the brokerage of the Police and Firefighters Pension Funds in St. Louis, Missouri.[1] Daniele was a police officer who had chaired the Police Pension Fund Board from April, 1985, to October, 1987.[2] He was indicted with six other co-defendants: Don Anton, a prominent lawyer, Aurora Anton, Don Anton's wife, Louis Monti, Executive Secretary of the Fire Pension Fund, Walter Klein, former Chair of the Police Pension Fund, Angelo Parato, Vice President of the Guaranty Trust Company, one of the Funds' money managers, and Charles Swanger, a city employee and former Trustee of the Fire Pension Fund.

The scheme was orchestrated by Don Anton, who received kickbacks through his corporations when brokerage was directed to the brokerage firm of I.M. Simon. All other defendants, except Daniele, pled guilty to various charges. Daniele maintained his innocence and has appealed his convictions, alleging the district court[3] erred in several evidentiary rulings, erred in refusing to grant a mistrial on two separate grounds, erred in refusing to grant his motion for acquittal, and erred in sentenc-

2. The Board consists of seven members. Three are elected police officers who serve staggered three year terms. The remaining members are the Comptroller of St. Louis, the President of the Board of Police Commissioners, and two citizen representatives appointed by the Mayor.

3. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

ing him to an aggregate eight years imprisonment. We affirm.

## I.

The government presented evidence that the kickback scheme began in 1982, when the Police and Fire Pension Fund monies were about to be split between three money managers, Joseph Glynn, Midwest Investment Advisory Services, and Guaranty Trust Company. Anton, Police Pension Fund President Walter Klein, and Fire Pension Fund Secretary Louis Monti directed the new managers, James Finch of Guaranty and James Bridges of Midwest, to use William Kennedy at I.M. Simon as a broker.

Kennedy paid Anton a portion of the commissions Kennedy received as a result of the Police and Fire Pension Fund trades. Joan Shaw, Kennedy's former girlfriend, testified that one portion of the commissions went to Kennedy while the rest went to Anton's corporation, Diversified Investments, Inc., for use by Anton and as a political slush fund. After Kennedy was fired, Thomas Pixley, President of I.M. Simon, paid the commissions directly to Diversified Investments, Inc.[4]

Finch and Bridges both used I.M. Simon as a broker when they began managing the Funds in 1983, but Bridges' use of Simon declined as time went on. Bridges requested a letter authorizing him to direct 100% of the brokerage to I.M. Simon, but none was forthcoming from the Police Fund.[5] Klein and Anton continued to pressure the managers to use I.M. Simon or risk being replaced as managers. Anton was particularly unhappy with Midwest's declining use of I.M. Simon.

In the summer of 1984, defendant Daniele sought to be elected to the Police Pension Board. He ran on an anti-Walter Klein, anti-Midwest, and anti-Guaranty Trust platform, complaining of high brokerage fees and low returns. Anton told Bridges of Midwest that he was supporting Daniele and that after the election Midwest would be replaced by Investment Counselors, Inc. (ICI), a firm more willing to divert brokerage to I.M. simon. Shaw also testified that Kennedy mentioned Daniele as Klein's replacement in 1984, because Klein was getting too "greedy" and wanted more money in exchange for directing the brokerage.[6] Daniele was elected to the Board in September, 1984.

In April, 1985, Daniele replaced Klein as the Chair of the Police Pension Board, with the support of all Board members except Klein and Klein's ally, Jenkens. The government presented evidence that Anton solicited the Mayor's help in Daniele's ouster of Klein (two Board trustees were mayoral appointees), and suggested to the Mayor's assistant, William Kuebling, that ICI be hired to replace Midwest. Anton and Daniele also both expressed a desire to Kuebling that Daniele be promoted to Sergeant. Kuebling testified that the Mayor had his own reasons for being dissatisfied with Klein and for those reasons agreed to support Daniele. Commissioner Frank, an attorney who was appointed to the Board shortly after Daniele, confirmed that all Board members, with the exception of Klein and Jenkens, wanted to remove Klein.

4. The government traced the cash received by Diversified Investments to Charles Swanger, who would split his payoff with Louis Monti and another unindicted individual. Diversified Investments also paid a portion of the kickback to Anton's other corporation, Dotto Enterprises, after which it was converted for use by Anton and his relatives. Kennedy's former girlfriend testified Walter Klein received kickbacks through his catering business and through cash payments of $1200 to $1500 per month. Approximately $58,000 in kickbacks could not be accounted for by the government, most of which was paid to Diversified Investments in 1983.

5. Louis Monti eventually provided a letter on behalf of the Fire Pension Fund, although the Chair of the Fire Pension Board testified he had no knowledge of the letter.

6. In statements to federal investigators, Daniele denied knowing Anton prior to becoming elected to the Board, and Anton later told Pixley that he had not in fact met Daniele until after Daniele was elected to the Board. The evidence showed Daniele paid for his own campaign expenses, and, with the help of his friend and fellow officer Barry Hinchey, wrote and distributed his own campaign literature.

After Daniele became Chair of the Police Pension Fund, Bridges of Midwest met with him in May and June to discuss a series of large stock purchases Midwest was considering.[7] When Bridges later asked Daniele about whether he had a preference for where the brokerage went, Daniele replied "you know what the program is." Bridges interpreted this comment as a direction to use I.M. Simon.

At the June 27, 1985, Board meeting, Daniele moved to replace Midwest with ICI, the firm touted by Anton. Board member Paul Berra, the Comptroller of the City of St. Louis, also supported ICI. The Board approved Daniele's motion, and Louis Bleile, Secretary of the Fund, delivered a letter to Bridges the next morning informing Midwest of the Board's decision. Midwest executed trades generating $90,-000 in commissions on this date prior to acknowledging receipt of the letter from Bleile at 9:30 a.m. This was the largest transaction Midwest had ever undertaken on behalf of the Fund.[8]

At the next Board meeting in July, Commissioner Frank convinced the Board to rescind its approval of ICI and to use competitive bidding.[9] Frank also moved to hire outside counsel to look into whether the Board had a cause of action against Midwest to recover the commissions generated on the last day trades. Daniele supported Frank's motion, which was passed by the Board, and cooperated with the attorneys conducting the investigation from the Sto-lar law firm. Daniele also contacted the SEC in August of 1985, requesting that Midwest be investigated because of its activities.

During the summer of 1985, Anton offered campaign assistance to police officers Daniele was supporting for President of the Police Officers' Association and for Police Pension Fund Trustee to replace Officer Jenkens. Daniele's friend and fellow officer, Barry Hinchey, told Daniele he thought Anton was a "con artist." Hinchey also got the impression Anton would ask for a quid pro quo favor in return for the campaign assistance. Hinchey was not elected as President of the Police Officers' Association, however, nor did either of the two officers Daniele was quietly supporting for Jenkens' Trustee position win the election.[10]

Meanwhile, Finch of Guaranty had told his staff to "test the waters" by placing their next stock trade with a broker other than I.M. Simon, to see if Daniele's presence signaled a change in the operation of the Police Pension Fund. Unbeknownst to Finch, one of his Vice Presidents, Anthony Parato, had been in on the kickback scheme for some time and shortly thereafter Parato told Finch Daniele wanted to have lunch. Five days before the lunch, Anton's appointment book reflects a meeting between himself, Daniele, and Parato. When Finch and Daniele met on November 29, 1985, Daniele told Finch: "I understand you're

---

7. Prior to this meeting, Bridges and Daniele had also met in an effort to "get acquainted," and, from Bridges' perspective, to discuss Midwest's investment philosophy and correct some misconceptions Midwest perceived in Daniele's campaign literature. Daniele apparently was concerned that Midwest was considering a lawsuit against him based on his campaign literature; Bridges assured him Midwest would not sue, but refused to write a letter to this effect when Daniele asked him for one.

8. Louis Bleile, in a letter to the SEC, stated that Bridges had said he (Bridges) had been called on the telephone the night before and notified of the Board's decision. At trial, Bridges denied having knowledge of the Board's decision prior to receipt of the letter from Bleile, and claimed Daniele orally authorized the last day trades on June 26, 1986, the day before Daniele moved to replace Midwest with ICI.

9. General American was later chosen through this process to replace Midwest. There was no evidence that General American used I.M. Simon as a broker or was pressured to do so.

10. Daniele asked Hinchey to run for President of the Police Officers' Association, and was also supporting two officers, Jack Nieman and Jack Gaffigan, for Jenkens' seat on the Pension Board. Hinchey testified he and Daniele met Anton in a parking lot late one Sunday night, where Anton told Hinchey he knew someone who would help pay expenses for the officers Daniele was supporting. Hinchey later received mailing labels from the predecessor of ICI; campaign materials for Hinchey and Nieman were paid for, in part, by I.M. Simon; and Anton mailed Hinchey's campaign literature from his office.

going to test the waters, and I would strongly advise against that." Finch continued to use I.M. Simon as a broker.

Bridges of Midwest and Pixley of I.M. Simon eventually agreed to cooperate with law enforcement personnel and to tape conversations with Anton.[11] The tapes reveal that Anton had obtained knowledge of the Pension Fund's decision to sue Midwest, although the matter was supposed to be kept secret. Anton was concerned about the suit and what it might reveal about his receipt of funds from I.M. Simon.[12]

Anton also told Pixley that Daniele had informed him of allegations made by Harry Barr, who for nine months had taken Angelo Parato's position at Guaranty. Daniele had reported these allegations to Commissioner Frank in February, 1986, after a fellow officer told Daniele about them. Daniele had a telephone conversation with Barr in late February, after which he had, according to Anton's appointment book, two meetings with Anton. In Pixley's first taped conversation with Anton on March 16, Anton related to Pixley some of the details of Barr's allegations.

On March 19, 1986, at Commissioner Frank's suggestion, Daniele and Andrew Puzder of the Stolar law firm went to Boston to interview Barr. Daniele tape recorded the conversation and gave the cassette to attorney Puzder. On the tape, Barr described Anton as the recipient of funds from I.M. Simon: "I think the first step of some of it was Don Anton." On the plane back from Boston, when Puzder asked Daniele whether he knew Anton, Daniele said no.

On March 21, 1986, Daniele went to federal investigators at Frank's suggestion and told them about the allegations the Pension Board was making in its suit against Midwest and Walter Klein, which had recently been filed. Daniele did not mention either Barr or Anton and the investigators did not ask about them. Three days later, on March 24, Anton's appointment book reflects another meeting with Daniele. In a taped conversation on March 26, Anton revealed to Pixley his knowledge of Daniele's trip to Boston and the substance of Daniele's interview with Barr.

Anton's appointment book shows four more meetings with Daniele in April, four in May, and two in June. On July 7, 1986, Anton's records were seized by agents executing a search warrant of his office. This search, along with the counterclaim which had recently been filed by Midwest against the Pension Board, generated publicity in the local press. When Anton's picture first appeared in the paper, Commissioner Frank asked Daniele about him, and Daniele again claimed he did not know Anton.

At the same time the search warrant was issued, Federal Grand Jury subpoenas were also served on Anton and Pixley, who met on July 13 to destroy the records that had been subpoenaed which reflected the kickbacks I.M. Simon had been paying to Anton. As the records were being burned,[13] Anton described the roles of the others involved in the kickback scheme: both Daniele and Louis Monti "directed brokerage," but neither had received "a dime" from Anton.[14] Anton "tried to help [Daniele] get a promotion," but in Anton's view, Daniele was qualified and deserved

**11.** Bridges' first tape recorded conversation occurred January 24, 1986; Pixley's first conversation took place March 16, 1986.

**12.** Anton later told Pixley that Daniele would attempt to get the Midwest lawsuit dropped by making a motion not to pay the lawyers. Daniele never made such a motion, although Commissioner Frank testified Daniele's feelings toward the Stolar firm became somewhat negative or antagonistic in the summer of 1986.

**13.** Anton's wife retyped bills from Diversified Investments, Inc., to I.M. Simon in an effort to justify the payments made, and these "dummied

up" bills were produced to the grand jury. Daniele's name appeared on a number of bills at meetings which Anton included in his "consultation services."

**14.** In fact, the government presented evidence that Monti did receive money from the kickback scheme through cash payments from Charles Swanger, who received money directly from Anton's corporation, Diversified Investments, Inc. In pleading guilty, Monti acknowledged receiving a third of the approximately $50,000 in payments made to Swanger over the course of the scheme.

it.[15] Commissioner Frank had shared this view until he found out that Daniele had lied to him when Daniele admitted knowing Anton in a newspaper article in August of 1986.

In March of 1987, Daniele met again with federal investigators. He told them he had first met Anton after he became a Trustee and had met with Anton approximately twenty-four times since he had become Chair of the Pension Fund Board.[16] Daniele described Anton as a "pushy" individual who promoted various money managers. Daniele denied meeting with Anton and Parato together, although Anton's records reflected five such meetings and a representative from money manager U.S.A. Continental testified he attended one such meeting in April, 1985. Daniele did tell investigators of his meeting with Barr in February, 1986, claiming he told Anton of the meeting only after the publicity had occurred in June or July of 1986. Daniele informed the agents he became suspicious of Anton only after Anton had asked him to talk to the U.S. Attorney in September, 1986, to request that Klein not be given immunity because Klein "was the only one that could hurt" Anton.[17]

Captain Harmon, Commander of the Internal Affairs Division, testified that he too met with Daniele over the course of the police department's own investigation of the Pension Fund brokerage, that Daniele cooperated with their investigation, and that Daniele wrote the Chief on July 3, 1986, requesting that Internal Affairs take custody of all the Pension Fund records. Daniele never mentioned Anton's name to Harmon, however, even though Harmon met with Daniele during the same time period Anton had asked Daniele to intervene with the U.S. Attorney regarding immunity for Klein.

## II.

On appeal of his convictions, Daniele raises a number of arguments, three of which pertain to the evidentiary rulings made by the district court in response to the government's motion in limine, which the government filed at the close of its case. We consider each of these evidentiary rulings first.

### A. Testimony of Louis Bleile

■ Louis Bleile was the Secretary of the Police Pension Fund. The government moved to preclude Bleile from testifying about statements made by James Bridges of Midwest on the day Bleile delivered the Board's termination letter to Midwest. Defendant and the government agreed that Bleile would testify, contrary to what Bridges stated at trial, that Bridges told Bleile he (Bridges) was given advance notice of the Board's decision to terminate Midwest. According to Bleile, Bridges knew, at the time he ordered the "last day trades," that Midwest had been fired.

The government alleged this testimony was inadmissible hearsay and, further, was extrinsic evidence of impeachment of Bridges' testimony forbidden by Fed.R. Evid. 608(b). The district court ruled the evidence was inadmissible hearsay. On appeal, defendant argues the testimony was admissible under Fed.R.Evid. 613(b) as a

---

**15.** The evidence showed Daniele had "scored tops on the tests," was an excellent shot and a member of the pistol team, and belonged to the major case squad and the hostage rescue team. Although Commissioner Frank believed politics did not play a role in determining promotions within the police department, Officer Hinchey testified that in order to get promoted, "you have to find someone within the department or outside the department with political or financial power, some kind of power, to get you promoted."

**16.** Anton's appointment book reflects twenty-two meetings between Anton and Daniele in the first six months of 1986 alone.

**17.** In August, 1987, Daniele made another statement denying Anton's help in his becoming a Trustee, denying directing brokerage to I.M. Simon, and denying getting any money from the system. In fact, the government conceded it had offered no proof that Daniele received any portion of the kickback; the government contended his motivation for participating in the scheme was to get political help with a promotion. Daniele stated the only thing he had ever done for Anton was to support ICI, but he thought that was alright because Paul Berra, the Comptroller, was supporting ICI as well.

prior inconsistent statement,[18] and we agree.

The government nonetheless argues any error in excluding Bleile's testimony was harmless, because Daniele was allowed to cross-examine Bridges on the basis of Bleile's letter to the SEC. *See* note 8, *supra.* Bleile's testimony, as described by defendant, would have been the same as the statements Bleile made in his letter to the SEC about Midwest's last day trades. Under these circumstances, we agree the court's exclusion of Bleile's testimony did not constitute reversible error. *See Anderson v. United States,* 788 F.2d 517, 520 (8th Cir.1986).[19]

### B. The Videotape

■ The government's in limine motion also requested that the court preclude defendant from introducing into evidence a videotape of the July 25, 1985, Police Pension Board meeting. This was the first meeting after Daniele had moved to fire Midwest and hire ICI, at which the Trustees agreed to rescind their vote in favor of ICI and to use competitive bidding. The minutes of the meeting were admitted into evidence, and the government contended the tape itself was hearsay. The tape was not an official record, but was made by Walter Klein and given to the government.

Defendant argued before the district court, as he does on appeal, that the video-tape provides the best evidence of what occurred at the meeting and demonstrates all Board members initially favored ICI. Defendant further contends the tape shows that the meeting was an open forum, not in any way "controlled" by Daniele. Defendant asserts on appeal that the tape should have been admitted under Fed.R.Evid. 803(24), the "catchall" hearsay exception.[20]

Defendant failed, however, to advise the district court of his reliance on Rule 803(24) at trial. When asked by the court how he overcame the government's hearsay objection, defendant's counsel replied, "I don't know that I do, Judge." Although counsel went on to argue the tape would serve to aid the jury in seeing and hearing what took place at the meeting, counsel did not respond to the court's invitation to cite a rule which would support the admissibility of the videotape.

■ Under these circumstances, we can hardly fault the district court for refusing to admit the tape under the rule now cited for the first time to this Court. Moreover, while the recording was relevant and contained sufficient guarantees of trustworthiness to be admissible under Rule 803(24), the trial judge has broad discretion to determine the admissibility of evidence, *see United States v. Dorian,* 803 F.2d 1439, 1443–44 (8th Cir.1986), and could have excluded the tape on the basis that it was cumulative. Defendant was allowed to

---

**18.** Fed.R.Evid. 613(b) provides:
Extrinsic evidence of a prior or inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

**19.** In reaching this decision, we have not considered, nor do we express any view on, the effect of any new evidence obtained during civil proceedings brought against Midwest, and others, by the Police Pension Board. A motion for a new trial based on newly discovered evidence is properly directed to the district court in the first instance.

**20.** Fed.R.Evid. 803(24) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

cross-examine Commissioner Frank concerning the content of the meeting and the minutes had been admitted as evidence. We thus find no reversible error in the court's ruling on this issue. *See Anderson*, 788 F.2d at 520.

### C. Potential Cross–Examination of Defendant

 Finally, the government requested the court rule, in advance of defendant's taking the stand, that the government would be allowed to cross-examine him about whether in 1985 he had lied to IRS investigators. The government contended defendant had lied about false records he had kept in 1983 and 1984 to cover up cash he was allegedly skimming from video games placed at a liquor store he owned.[21]

The government became aware of defendant's activities through the cooperation of Steven Spicer, who collected the cash taken in by the video games and who paid defendant a percentage of the receipts as a fee for allowing the machines to be placed in the store. The government had also searched the business premises of Darwin Price, who owned the video games.

In February, 1986, defendant agreed to cooperate with the government and was assured that nothing he told investigators would be used against him, either directly or indirectly. Defendant was neither charged nor convicted of any crime in connection with the alleged skimming.

In response to the government's in limine motion, the court ruled that "there will be a full cross-examination subject to whatever proper objections are raised at the time it's conducted." Defendant interpreted this ruling as allowing the government to cross-examine him on the alleged prior skimming incident, and argues on appeal this ruling caused him not to testify in his own behalf, as defense counsel's opening statement had predicted he would do.

Defendant urges that the court's ruling constitutes reversible error because the evidence of his prior skimming (1) was only offered to prove his character, which is prohibited, *see* Fed.R.Evid. 404(b); (2) would be obtained from statements he made while cooperating with the government, statements which the government had agreed would *not* be used against him; and (3) was so prejudicial that under Fed.R. Evid. 403 it should have been excluded.

Under Fed.R.Evid. 608(b), the court may, in its discretion, allow cross-examination of specific instances of conduct of a witness probative of the truthfulness of that witness.[22] The government maintained that defendant's lies to investigators were probative of his truthfulness and that evidence of this conduct was obtained prior to defendant's offer of cooperation through the government's own investigation in 1984 and 1985.

In determining the extent of cross-examination allowed under Rule 608, the trial court generally balances each question's relevance to honesty and veracity with its prejudicial impact. *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir.1980); *United States v. McClintic*, 570 F.2d 685, 690–91 (8th Cir.1978). We view the district court's statement in this case as an indication that the court would do precisely that. Defendant apparently sought to have the court rule, in response to the government's in limine motion, that all cross-examination concerning his alleged lies to investigators would be foreclosed. We cannot say the court abused its discretion in refusing to so rule.

---

**21.** The store was owned by defendant's mother in name only, because police officers were precluded by Department rules from owning a liquor store.

**22.** Fed.R.Evid. 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

## III.

In addition to the in limine rulings discussed above, defendant also challenges the district court's denial of his motion for a mistrial after all his co-defendants had pled guilty and after the jury had heard the hearsay testimony of James Finch. Each of these grounds will be discussed in turn.

### A. Guilty Pleas

■ The indictment charged seven defendants. Prior to voir dire, outside the presence of the jury panel, defendants Monti and Swanger pled guilty. Voir dire began after their guilty pleas. Prior to the jury being selected, defendant Parato pled guilty. The court denied the remaining defendants' motion for a mistrial, and instructed the jury at the end of the court's preliminary instructions:

> Now at the beginning of these matters, or during voir dire, you were told that all defendants were accused of crimes in the indictment. Charges against defendant Parato have been disposed of, and he is no longer a defendant or party in this case. So we go on now.

After opening statements, defendants Anton and Klein pled guilty and co-defendant Aurora Anton was severed pending sentencing of her husband as part of the plea bargain. When the first witness was called to the stand by the government, only defendant Daniele remained in the case. The court instructed the jury:

> Members of the jury panel, as we began the case, Donald C. Anton, Aurora I. Anton, and Walter P. Klein were defendants in this cause. The case against them has been disposed of. They will no longer be a part of this trial. This should have no bearing on your decision as to whether the remaining defendant, Mr. Anthony Daniele, is guilty or not guilty.

Defendant again moved for a mistrial, based on the prejudice of the guilty pleas, the shortness of his opening statement in comparison to the government's (because time had been shared by all defendants), and the sharing of preemptory strikes. The court denied defendant's motion, not-

ing the considerable time and care that had gone into the selection of the jury, in part because of the publicity which the case had generated.

The defendant argues on appeal that the timing of the guilty pleas was prejudicial, because it allowed the government to highlight evidence in its opening statement without having to connect that evidence to defendant Daniele, who was a minor actor in the scheme in comparison to his co-defendants. Absent an abuse of discretion, however, this Court may not overturn the district court's refusal to grant a mistrial. The trial judge was in the best position to evaluate the potential prejudice to defendant from continuing after the other defendants' guilty pleas had been accepted. The court instructed the jury that the absence of the other defendants should have no bearing on the case against defendant Daniele, and we cannot say in this case that a mistrial was warranted based on their pleas. *See United States v. Lewis*, 759 F.2d 1316, 1341–42 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Lemm*, 680 F.2d 1193, 1205 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

### B. Hearsay Testimony

■ Defendant also claims the district court should have granted his motion for a mistrial based on the hearsay testimony of James Finch of Guaranty Trust. Finch testified he ran into defendant on the July 4, 1986, weekend at a fair. Defendant was on duty and the prosecutor asked Finch whether there was anything in particular that stood out in his mind about the meeting. After Finch recalled his conversation with defendant about rumors Finch had heard that Guaranty Trust was "in trouble with the trustees primarily because of the publicity," the prosecutor asked if anything else about this meeting stuck out in Finch's mind.

In response, Finch replied that his date had commented on the fact that defendant had "a pretty good roll of money and that the only bill showing was [a] $100 bill."

The district court sustained the defendant's objection and instructed the jury to disregard the hearsay statement. The court refused to allow the government to attempt to prove Finch himself saw the money.

Defendant argues Finch's hearsay statement was so prejudicial that the district court abused its discretion in refusing to grant a mistrial on this basis. As a general rule, the decision whether a trial has been so tainted by prejudicial testimony that a mistrial should be declared lies within the discretion of the district court. *United States v. Reed,* 724 F.2d 677, 679–80 (8th Cir.1984). Our review of the record convinces us that Finch's statement, while unquestionably prejudicial, did not so affect the defendant's substantial rights that a mistrial was warranted. *See United States v. Padilla,* 869 F.2d 372, 380 (8th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989).

The district court took immediate action to cure the error, and instructed the jury to disregard the statement. There is no evidence of bad faith on the part of the government, which had intended to elicit testimony that Finch himself had seen the money. The trial was three weeks long and involved numerous witnesses and documents. We cannot say the court abused its discretion in refusing to grant a mistrial on the basis of Finch's remark. *See Reed,* 724 F.2d at 680.

### IV.

■ At the close of the government's case and at the close of all the evidence, defendant also moved for a judgment of acquittal. The trial court denied the motion. The defendant renewed his motion after the jury's verdict and contends on appeal there is insufficient evidence upon which to convict him of mail fraud, conspiracy, and extortion or attempted extortion.

Defendant's primary argument is that he was not involved in the mail fraud, conspiracy, or attempted extortion which his co-defendants may have participated in. Dan-

iele claims he had no knowledge of the essential nature and scope of the conspiracy and had no specific intent to defraud because he did not know brokerage was being directed or that anybody was receiving kickbacks.

There is evidence which supports defendant's position. There is no evidence defendant received any money from anyone as a result of the scheme, which started long before he became a member of the Police Pension Board. There is evidence that defendant ran for the Board on a platform which disparaged the money managers involved in the scheme based on their poor performance and high commissions, and that his actions on the Board were consistent with the actions of other Board members who were also concerned about the managers' performance. Defendant supported the investigation of Midwest and reported them to the SEC, actions which were arguably against the interests of those involved in directing brokerage through Midwest. Defendant also appeared to have been responsible for bringing the allegations of Harry Barr to the attention of Commissioner Frank, and cooperated with Frank in investigating the allegations made by Barr against Guaranty Trust.

Viewing the evidence in the light most favorable to the jury's verdict, however, there is also evidence from which a jury could conclude that Daniele had knowledge of the scheme, acted as Anton's "spy in the camp," and directed brokerage himself.[23] Daniele lied about his knowledge of and relationship with Anton, he provided Anton with secret information about the Board's actions, he told Bridges of Midwest "you know what the program is," and he told Finch of Guaranty Trust not to "test the waters." Anton's records show numerous meetings with Daniele and his tape-recorded statements implicate Daniele directly. These co-conspirator statements were properly admitted by the district court. *See Bourjaily v. United States,* 483 U.S. 171,

**23.** We again base our decision solely on the record before the district court and do not consider any evidence which may have been ob-

tained in the civil action brought against Midwest.

176, 181, 107 S.Ct. 2775, 2779, 2781, 97 L.Ed.2d 144 (1987); *United States v. Townsley,* 843 F.2d 1070, 1084 (8th Cir.), *rehearing en banc on other grounds,* 856 F.2d 1189 (8th Cir.1988).

While the evidence against the defendant was by no means overwhelming, there is substantial evidence from which a jury could reasonably infer he was guilty of the crimes charged beyond a reasonable doubt. *See United States v. Karunatileka,* 820 F.2d 961, 965 (8th Cir.1987); *United States v. McCrady,* 774 F.2d 868, 874–75 (8th Cir. 1985); *United States v. Lemm,* 680 F.2d 1193, 1205 (8th Cir.1982).

### V.

■ Defendant maintains that even if each of the above errors, standing alone, does not justify reversal of his convictions, the cumulative effect of the errors had a substantial influence on the jury's verdict and resulted in an unfair trial. Our review has revealed two errors: Finch's hearsay statement which was immediately stricken from the record by the district court, and the court's exclusion of Bleile's testimony about Bridges' prior inconsistent statement. This latter error related to whether Midwest had acted improperly in making the "last day trades," a matter which was central to the civil action against Midwest but which was not so central to the issue of Daniele's knowledge or intent that it is likely the judgment was substantially affected by it. Considering the trial as a whole, we find the above errors do not justify reversal of defendant's convictions.

### VI.

■ Finally, defendant argues the district court erred in sentencing him to an aggregate eight years imprisonment and $200,000 joint restitution with co-defendant Anton. He argues the sentence is excessive, particularly in view of the sentences received by his co-conspirators, all of whom were proven to have received money from the scheme and to have been more actively involved in it.

Our review of sentences is limited where, as here, the sentence imposed is within the statutory maximum. Counsel informed the court at oral argument that the district court has granted Anton's motion for a reduction in sentence upon his repayment of the $200,000 in restitution. Defendant Daniele's sentence is now the longest of all defendants, although Anton's payment of the $200,000 in joint restitution presumably has absolved defendant of this obligation. While we cannot say defendant's sentence must be reversed under these circumstances, we urge the district court to consider carefully any motion for a reduction of sentence under Fed.R.Crim. P. 35 which defendant may file.

### VII.

For all of the foregoing reasons, the judgment and sentence of the district court are affirmed.