**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anthony Roderick PHILLIP,**
**Defendant–Appellant.**

**No. 90–6506.**

United States Court of Appeals,
Sixth Circuit.

Argued May 23, 1991.

Decided Oct. 30, 1991.

Joseph M. Whittle, U.S. Atty., Steven W. Wilson, Sp. Asst., Louis A. Chiarella (argued and briefed), Office of the U.S. Atty., Louisville, Ky., for plaintiff-appellee.

Paul Musselwhite (argued and briefed), Radcliff, Ky., for defendant-appellant.

Before MERRITT, Chief Judge, and GUY and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Defendant Anthony Phillip appeals his conviction and sentence for the second-degree murder of his four-year-old son Jamal, and for committing and permitting first-degree criminal child abuse.

The issues before us on appeal are as follows:

1. Whether the district court erred in admitting the testimony of criminal investigators who questioned Phillip without informing him of his *Miranda* rights;

2. Whether the district court abused its discretion in admitting allegedly irrelevant and unduly prejudicial testimony concerning bloodstains at the crime scene;

3. Whether the district court violated Phillip's due process rights by not allowing discovery of a videotape made by the prosecution;

4. Whether the district court erred in failing to instruct the jury with respect to a lesser included offense;

5. Whether the district court's fact-finding that Phillip failed to accept responsibility for his crimes is clearly erroneous; and

6. Whether the district court erred in departing upward from the sentencing guidelines range.

Perceiving no error or abuse of discretion in the district court's rulings, findings, and jury instructions, we affirm.

## I.

Anthony Phillip, a civilian employee of the United States Army, resided with his wife Gail, two-year-old daughter Cagney, and six-year-old son Roderick on a federal military reservation in Fort Knox, Kentucky. Jamal, Phillip's son by another woman, came to live with the family about two months before the child's death. According to Gail's testimony, Phillip routinely disciplined all of the children by striking them with a leather belt designated for that purpose. Soon after Jamal's arrival, Phillip began beating him for infractions such as putting his shoes and house slippers on the wrong feet, putting his pants on incorrectly, failing to replace his toothbrush on the rack, spending too much time in the shower or bathroom, failing to correctly answer questions, speaking in his mother's dialect, eating too quickly or too slowly, bed-wetting, displaying poor table manners, and refusing to say "Good night. I love you" to Phillip before bedtime. Phillip struck Jamal on many different body areas, including his arms, legs, back, buttocks, and face.

Phillip sometimes beat Jamal before leaving for work at 6:30 in the morning, as well as during lunch breaks; however, most beatings occurred in the evening, with an average of two to three beatings per day

for Jamal. Phillip struck Jamal an average of five times during a hand beating and inflicted ten lashes during a beating with the belt. The beatings resulted in numerous bruises and scars over much of Jamal's body. Gail also spanked or beat the child occasionally. Phillip remarked that he would stop beating Jamal if only the boy would follow instructions. Phillip sometimes asked six-year-old Roderick whether Jamal should be beaten.

Phillip believed that Jamal was "too fat," so he assigned him more exercises than he assigned the other children. Because of Jamal's bed-wetting, which first occurred after Jamal began living with the Phillips, Phillip directed him to sleep on the floor in the basement. While Phillip generally had difficulty coping with Jamal, he did not wish to return the child to his mother in his battered condition.

Four to six weeks after Jamal arrived, Phillip left his bedroom one evening to see whether Jamal had wet his bed. Later Gail noticed that Jamal had "two abrasions or bruises where just the top layer of skin is gone and you have that whitish pink area on his behind." Gail thought Jamal looked "out of it," but Phillip reassured her after verifying that Jamal could recall his own name and how many fingers he had. Soon thereafter, Jamal became ill, exhibiting lethargy and extreme thirst, and the injuries on his buttocks appeared infected. In Gail's words, "[i]t progressed to where it became sores and then an open wound." For a while Jamal could consume only liquid foods.[1] An expert witness testified that such wounds and symptoms are consistent with thermal or caustic injuries. After these wounds were inflicted, Jamal began walking slowly, "almost like a snail's pace." Fearing charges of child abuse, the Phillips decided not to consult a physician, although they did discuss the possibility of telling any concerned health-care workers that Jamal was already battered when they received him from his mother.

On the evening of the child's death, Phillip arrived home about six o'clock, and the family began eating dinner. Gail attempted to give Jamal a plate of regular food, but Phillip insisted that Jamal receive only a vegetable puree that Phillip blended himself. Later, Gail, Jamal, and Phillip were in the basement. Phillip gave Jamal an order, but Jamal just stared at Phillip, prompting Phillip to shake him. Phillip went upstairs to the kitchen while Gail and Jamal remained in the basement and Gail did the laundry. Phillip struck Roderick with the belt, apparently because Roderick had allowed Cagney to sit on the kitchen counter and play with a knife. Phillip hit Cagney as well.

Then Gail sent Jamal upstairs with some lint to be discarded in a garbage can. According to Gail, after she turned on the dryer, "I was about to go rewash my husband's sleeping bag, and just as I was about to pick it up and go on and do what I was going to do with it, I heard a little gasp or shriek, a thud and then Jamal came on down the stairs." Jamal "slinked down" on his back without somersaulting according to Gail, and she saw Phillip at the top of the stairs with the belt draped over his shoulder. Coming down the stairs, Phillip instructed, "Leave him alone, he will get up by himself." When Jamal remained limp, Phillip splashed cold water on his face and attempted cardiopulmonary resuscitation (CPR). Phillip then took Jamal to Ireland Army Hospital, where he later died.

A grand jury charged Phillip with murder in the second degree, in violation of 18 U.S.C. § 1111, and committing and permitting first-degree criminal abuse, in violation of 18 U.S.C. § 13 (Assimilative Crimes Act) and Ky.Rev.Stat.Ann. § 508.100. Gail Phillips, whom the grand jury indicted on the same charges, struck an agreement with the government under which she pleaded guilty to criminal abuse, signed a stipulation of facts, and testified as a government witness at her husband's trial. Testifying at his trial, Phillip generally corroborated his wife's testimony establishing a pattern of severe child abuse, but he

1. Soon he recovered the ability to eat solid foods, but Phillip nevertheless withheld them on occasion as a punishment when Jamal behaved passively or ate too slowly.

denied responsibility for Jamal's fatal injuries and fall. According to Phillip, he just heard a sound and turned around to discover that Jamal had fallen down the stairs. The government's theory is that Jamal died of injuries which Phillip inflicted just prior to Jamal's fall.

The physician performing Jamal's autopsy testified that he observed "healed, healing and recent injury to almost all body surfaces." The physician elaborated:

The injuries were healed in which the skin had scarred....

Some were healing.... [S]car formation was beginning....

Some of the wounds on other body surfaces, however, were recent. They were associated with contusions, bruising of the skin. They were associated with lacerations or tears of the mucus membranes of the mouth.

Additionally, there were a series of ulcers present on multiple body sites involving the skin. Two large, deep skin ulcers were present, one on each buttock.

Additionally, I saw evidence of injuries that on the skin are consistent with the application of a belt. There were whipping injuries to multiple body sites.

The subcutaneous tissues showed evidence of recent bleeding into the subcutaneous fat as a result of beating and additionally showed areas of resolving subcutaneous injury.... There was an ecchymosis, a contusion, a black eye of one of the eyes. There was associated hemorrhage under the white matter of one of the eyes.

....

I measured and described a multiplicity of injuries on multiple body surfaces.

The physician concluded that Jamal died from an acute subdural hematoma caused by blunt force cranial-facial injury, or a "beating." In the witness' opinion, "the bruises on the scalp and the face of the child were inflicted immediately prior to the development of the subdural hematoma. They were responsible for the tearing of the vessels." The physician concluded that Jamal died by homicide since the fatal injuries were not of the type resulting from a fall down the stairs.

The jury found Phillip guilty on all counts. The district court sentenced him to 30 years' confinement for the murder conviction, 10 years' confinement for committing criminal abuse, and 10 years' confinement for permitting criminal abuse, with the three sentences to run concurrently. The district court also imposed 5 years' supervised release, restitution, and participation in an approved mental health program.

## II.

### A.

#### Admissibility of Statements Made to Investigators

After Phillip took Jamal to the army hospital emergency room, hospital staff contacted the United States Army Criminal Investigation Division (CID), which sent agents to the hospital to question Phillip. CID agents routinely investigate serious crimes and accidental deaths occurring on government lands. Special Agent Ken Eggers testified that knowing only that a child without a pulse had been taken to the hospital, he interviewed Phillip in a hallway near the emergency room for approximately five minutes. Eggers then walked away from Phillip and positioned himself outside the emergency room to facilitate his receipt of updated information concerning Jamal's condition.

CID Agent Thomas Wright testified that he arrived at the hospital and spoke with Eggers. According to Wright, he then interviewed Phillip for five to ten minutes in a nearby treatment room in order to fill out an interview worksheet calling for personal data. Wright asked Phillip what happened, and Phillip related that he heard a noise, turned around, and saw that Jamal had fallen down the steps. Wright then inquired whether the child had any prior injuries not arising from the accident, and Phillip responded that a boyfriend of Jamal's mother had injured the child.

According to Wright, no one intended to arrest Phillip at that point because the

agents had no information indicating that a crime had been committed. After the interview, Phillip walked over to a counter to wait for information about Jamal. According to the CID agents, neither of them told Phillip to remain at the hospital. While a military policeman was posted at the emergency room entrance, apparently as routine duty, there is nothing to indicate that the military policeman knew anything about Jamal's injuries or would have prevented Phillip from leaving the hospital if he had attempted to do so.

Phillip's version is different. He testified that one of the agents interviewed him for 20 to 30 minutes, and after one interview, the agent told him to stay in the room. After the agents arrested Phillip following their inspection of Jamal's body, Phillip refused to speak with them further and requested counsel. Before trial, Phillip filed a motion to suppress the statements made to the agents on the ground that the CID agents failed to advise him of his *Miranda*[2] rights prior to questioning. The government responded that the agents had no duty to inform Phillip of his rights because he was not in custody. After hearing evidence at a suppression hearing, the district court concluded:

> [T]he preponderance of the evidence persuades me that the defendant at the time he made whatever statements he did make was not in custody, was not in detention, was not subject to being restrained, that no reasonable person would have thought that he could not have left had he wanted to. It seems to me it's far more logical that he was there out of concern for this child than any problem with the concept of detention.

■ The Supreme Court has established that *Miranda* warnings are necessary "only where there has been such a restriction on a person's freedom as to render him 'in custody'." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Coercive environments not rising to the level of formal arrest or restraint on freedom of movement do not constitute custody within the meaning of

*Miranda. See id.; see also United States v. Knox,* 839 F.2d 285, 293 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Consequently, the issue before us is whether there was a formal arrest or a "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quotation omitted). We must inquire "how a *reasonable* man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (emphasis added); *United States v. Macklin,* 900 F.2d 948, 951 (6th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990).

■ The district court was entirely justified in crediting the CID agents' testimony concerning the questioning at the hospital, and according to that testimony, the circumstances surrounding the questioning were such that no reasonable person in Phillip's position would have inferred that he or she was not free to leave. Accordingly, we conclude that in reaching its determination that the CID agents did not violate Phillip's Fifth Amendment right, the district court applied the appropriate legal standard to fact-findings which are not clearly erroneous.

### B.

### Admissibility of Bloodstains Evidence

#### 1.

#### Relevance

Investigators discovered numerous tiny stains, later found to consist of human blood, on the Phillips' kitchen door at the entrance to the basement. The government presented expert testimony concerning the stains as evidence supporting its contention that Jamal died as a result of blows inflicted before his fall. Gail testified that prior to Jamal's death, she had not noticed any bloodstains on the kitchen door, even though she had been up and down the stairs more than five times on the

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.    1602, 16 L.Ed.2d 694 (1966).

day of Jamal's death. Phillip objected to the admission of the expert testimony on the ground that the testimony was irrelevant in view of the investigators' inability to determine the source or vintage of the blood.

Under the Federal Rules of Evidence, relevant evidence is generally admissible while irrelevant evidence is inadmissible. Fed.R.Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. We accord the district court "broad discretion" in determining whether or not to admit evidence "based on considerations of relevance and materiality." *United States v. Walton*, 909 F.2d 915, 925 (6th Cir.1990).

■ Here the district court reasoned:
[A] blow to the head that would be sufficiently severe to cause the subdural hematoma could very well have inflicted some form of laceration or other open wound that could very well lead to blood spattering.

. . . .

[T]he jury might very well draw an inference that blood was put there by this child being struck, and ... he does have some lacerations on his head.... [In view of] the fact that [there] were physical signs of injury, external force, coupled with the subdural hematoma, blood spatters on the door, I think the circumstantial evidence is sufficient to ... make it admissible.

Because Gail had not seen blood in the area of the door before Jamal's death, the investigators' inability to identify the source and age of the human blood is relatively insignificant. Accordingly, we hold that the district court did not abuse its discretion in finding the evidence relevant.

### 2.

### Probative Value and Prejudicial Effect

■ Phillip also objected to admission of the expert testimony on the ground that

even if the testimony was relevant, its unduly prejudicial effect outweighed its probative value.

Under the Federal Rules of Evidence, a district court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice that admission of the evidence would pose. Fed.R.Evid. 403. The admission of relevant but potentially prejudicial evidence rests within the sound discretion of the district court. Phillip contends that the experts' testimony left the jury with the mistaken and prejudicial impression that "the quarters were liberally splattered with blood ... somehow improperly caused by the appellant" and that Phillip therefore is "one bad person and should be convicted regardless of whether he committed the crimes [charged]." We disagree. Phillip's characterization of the effect of the expert testimony upon the jury is simply not warranted.

Admittedly, some jurors' mental images of the blood-splattered door and of possible events related to the splattering could have a strong impact. Nonetheless, the testimony was not shown to be cumulative, exaggerated, or unduly emphasized. Moreover, introduction of this evidence does not appear unduly or unfairly prejudicial in view of the government's burden to establish that Phillip had committed the type of grisly act which could have produced the tiny bloodstains.

Accordingly, we hold that the district court did not abuse its discretion in admitting the expert testimony concerning the bloodstains.

### C.

### Admissibility of Bloodstain Pattern Analysis Evidence

■ Phillip objected to the admission of testimony concerning bloodstain pattern analysis on the grounds that the testimony was not relevant or that the prejudicial effect of the testimony outweighed any probative value.[3]

---

**3.** The goal of bloodstain analysis is to evaluate a     bloodstain pattern in light of knowledge con-

249

Robert Spalding, an FBI expert on the subject of bloodstain pattern analysis, testified that the stains on the kitchen door leading to the basement were a "medium velocity impact spatter ... typical of the type of thing that would result from a beating of an individual or beating of a source of blood." Spalding used long strings charting the respective paths which the blood droplets followed as they traveled toward, and eventually impacted, the door. According to Spalding's testimony, the intersection of the strings indicated a source in the kitchen between 40 and 48 inches above the floor.[4]

Applying the standards outlined above in subsection B, we conclude that the testimony concerning bloodstain analysis was relevant and not unduly prejudicial. The analysis demonstrated that the bloodstain evidence was at least consistent with the type of blows which Phillip allegedly inflicted on Jamal immediately prior to his fall. Accordingly, we hold that the district court did not abuse its discretion in admitting the pattern analysis testimony.

## D.

### Discovery of Videotape

Shortly after Jamal's death, the government videotaped an interview with six-year-old Roderick. The interviewers, a CID agent and a social worker, questioned the child for several hours. Early in the trial, apparently by accident, Phillip's counsel learned of the existence of the videotape, and sought to obtain a copy of it through discovery. Phillip argued that he was entitled to discover the videotape under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) and/or Fed. R.Crim.P. 16(a)(1)(C). Near the end of the trial, after reviewing the videotape, the district court denied Phillip's motion to discover, and explained as follows:

[T]he court finds that the witness, who is or was at the time of the interview less than six years old, is *extremely impres-*

sionable. He gave what might be described as *wildly inconsistent* answers to questions about the events of the evening in question ... and therefore, any statements he made on that tape are *not exculpatory* evidence required by the United States to be disclosed, to which the defendant objects.

(Emphasis added.) Without subscribing to the district court's reasoning, we conclude that its refusal to order that the videotape be turned over was not error.

### 1.

### *Brady* Material

The Supreme Court has established that a criminal defendant's right to due process imposes upon the government an obligation "to turn over evidence in its possession that is both favorable to the accused and *material to guilt....*" *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (emphasis added); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196.

Significantly, the issue of materiality for *Brady* purposes pertains only to the question of a defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial. *United States v. Agurs*, 427 U.S. 97, 112 n. 20, 96 S.Ct. 2392, 2401–02 n. 20, 49 L.Ed.2d 342 (1976); *see also United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir.1988). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001; *see also Presser*, 844 F.2d at 1282. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001. Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes. *See, e.g., United States v. Kennedy*, 890

4. Jamal's height apparently fell in this range.

cerning how blood acts under different circumstances and to the extent possible, to reconstruct the actions which produced the pattern.

F.2d 1056, 1059–60 (9th Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir.1983); *United States v. Cuthbertson,* 651 F.2d 189, 195, 200 (3d Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981). Because materiality under *Brady* presents a mixed question of law and fact, *United States v. Rivalta,* 925 F.2d 596, 598 (2d Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 215, 116 L.Ed.2d 173, our standard of review is *de novo.*

■ We conclude that the videotape was not material for *Brady* purposes because it was inadmissible as evidence. Any exculpatory statements by Roderick on the videotape could be useful to the defendant only if offered for their truth and, therefore, they would be inadmissible hearsay. Fed.R.Evid. 801–04; *cf. United States v. Hatchett,* 918 F.2d 631, 642 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1008 (1991); *United States v. North,* 910 F.2d 843, 906–07 (D.C.Cir.1990), *withdrawn in part, and superseded in part, on other grounds,* 920 F.2d 940 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *United States v. Daniele,* 886 F.2d 1046, 1053 (8th Cir.1989); *Oriental Health Spa v. City of Fort Wayne,* 864 F.2d 486, 490–91 (7th Cir.1988). The hearsay statements were not admissible for impeachment purposes, since Roderick did not testify at the trial. Likewise, the videotape contained no information leading directly to admissible evidence favorable to the defense.

■ Moreover, we additionally and independently conclude that even if the videotape were admissible as evidence, it would not, under any circumstances, have changed the trial's result. We reach this conclusion after evaluating the possible effect of the videotape when taken in the context of the entire record before the jury. *Cf. Agurs,* 427 U.S. at 114, 96 S.Ct. at 2402. Phillip argues that the videotape was at least partly exculpatory because, in the course of the lengthy interview, Roderick stated that Phillip did not strike Jamal on the night the child died and made other statements generally supportive of the appellant's recollection of the events. Having thoroughly reviewed the videotape ourselves, however, we agree with the district court that the testimony of young, impressionable Roderick was wildly inconsistent and self-contradictory. While, several times during the lengthy questioning, the child made contradictory statements partially exculpating his father with regard to beating Jamal on the night Jamal died, the child's statements, taken as a whole, are heavily inculpatory.

Accordingly, we hold that since the defendant's possession of the videotape would not have changed the trial's outcome, the government did not violate Phillip's due process rights by withholding the videotape.

### 2.

### Rule 16

The Federal Rules of Criminal Procedure provide in pertinent part:

Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are *material* to the *preparation* of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Fed.R.Crim.P. 16(a)(1)(C) (emphasis added).

■ We review a district court's rulings under Rule 16 only for abuse of discretion. *Cf. United States v. Balk,* 706 F.2d 1056, 1060 (9th Cir.1983). A defendant does not satisfy Rule 16(a)(1)(C)'s requirement that an object be "material to the preparation of the defendant's defense" by means of merely conclusory arguments concerning materiality. *United States v. Cadet,* 727 F.2d 1453, 1468 (9th Cir.1984). Rather, to obtain discovery of the object, the defendant must make a *prima facie* showing of materiality. *Id.*

Phillip asserts in conclusory fashion that access to the videotape early in the trial would have aided him in the preparation of his defense, but he does not state convincingly *how* the videotape would have assisted him. He does suggest that viewing the videotape would have allowed him to reach a more informed decision concerning whether or not to depose Roderick or to subpoena him as a defense witness. However, since Roderick was his son, Phillip was aware of Roderick's potential availability to testify concerning Phillip's battering of Jamal. Moreover, early access to the videotape certainly could not have enlightened Phillip with respect to the *wisdom* of deposing Roderick or calling him as a witness. In the taped interview, Roderick at times makes exculpatory statements concerning his father and at times makes inculpatory statements. On the whole, the videotape is inculpatory in nature and reveals a highly impressionable young child making highly inconsistent statements within a short period of time. Additionally, during the interval between Jamal's death and Phillip's trial, Roderick began living with relatives hostile toward Phillip, and the possible long-term effects of these relatives' attitudes upon Roderick's perceptions concerning relevant events remain unknown.

Under these circumstances, early access to the videotape would have informed Phillip that if deposed or placed on the witness stand, Roderick might 1) make exculpatory statements, 2) make inculpatory statements, 3) make both exculpatory and inculpatory statements, and/or 4) have little memory of relevant events. After viewing the videotape, Phillip would have been in no better position to evaluate the wisdom of deposing Roderick or calling him as a witness. Accordingly, we conclude that the videotape was not material to the preparation of Phillip's defense, and that consequently the government and district court did not violate Rule 16(a)(1)(C) by denying early access to the videotape.

Furthermore, we conclude that even if Rule 16 was violated, no prejudice to the defense resulted. The Federal Rules of Criminal Procedure include a harmless error standard: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). This standard applies to violations of Rule 16(a). *United States v. Lockhart*, 865 F.2d 1269 (6th Cir.1989) (unpublished disposition); *United States v. Barragan*, 793 F.2d 1255, 1259 (11th Cir. 1986); *United States v. Rossetti*, 768 F.2d 12, 15 (1st Cir.1985); *United States v. Reed*, 724 F.2d 677, 680–81 (8th Cir.1984). Generally, an error not rising to constitutional significance is harmless "unless it is more probable than not that the error materially affected the verdict." *Cf. United States v. Neuroth*, 809 F.2d 339, 342 (6th Cir.), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). Here, the generally inculpatory videotape would have counseled the defense to refrain from calling Roderick as a witness, and defense counsel in fact did refrain from calling him.

### E.

### Instruction on Lesser Included Offense

Phillip takes issue with the district court's decision not to instruct the jury concerning second-degree criminal abuse, which Phillip contends is a lesser included offense with respect to first-degree criminal abuse.

A court should instruct the jury concerning a lesser included offense "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Hopper v. Evans*, 456 U.S. 605, 612, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982) (quotation omitted); *United States v. Levy*, 904 F.2d 1026, 1031 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). A person commits second-degree criminal abuse under Kentucky law if the person performs certain acts "wantonly," that is "when he is aware of and consciously disregards a substantial and unjustifiable risk that the [illegal] result will occur or that the [illegal] circumstance exists." Ky.Rev.Stat.Ann. §§ 501.020(3), 508.-

110(1).[5] A person commits first-degree criminal abuse if the person performs identical acts "intentionally," that is, with a "conscious objective ... to cause [the illegal] result or to engage in [the illegal] conduct." Ky.Rev.Stat.Ann. §§ 501.020(1), 508.100(1).[6]

This case does not present a situation where a parent has placed a child in harm's way with no particular desire that harm ensue. The evidence does not indicate that, for example, Phillip struck and injured Jamal while flailing aimlessly or pursuing unrelated goals. Rather the evidence strongly indicates that Phillip struck and injured Jamal, and permitted Gail Phillip to do so, with the conscious and express goal of inflicting severe pain. *Cf. Carpenter v. Commonwealth*, 771 S.W.2d 822, 824–25 (Ky.1989).

Accordingly, because the jury could not rationally find Phillip guilty of second-degree criminal abuse yet not guilty of first-degree criminal abuse, we hold that the district court did not err in denying Phillip's request for an instruction on second-degree criminal abuse.

## F.

### Application of Sentencing Guidelines

#### 1.

### Acceptance of Responsibility

■ Under the Sentencing Guidelines, a defendant qualifies for a two-level reduction in offense level if the defendant "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." U.S.S.G. § 3E1.1(a). The defendant bears the burden of demonstrating acceptance of responsibility, *United States v. Christoph*, 904

F.2d 1036, 1040 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991), and we review a district court's decision to grant or deny a reduction for acceptance of responsibility only for clear error. *United States v. Guarin*, 898 F.2d 1120, 1122 (6th Cir.1990).

■ As the district court noted, while Phillip admitted his culpability for beating Jamal, he still has not admitted his culpability with respect to the child's death. Moreover, Phillip and his wife originally told the CID agents and other individuals that Jamal received his numerous injuries from his mother's (fictitious) boyfriend. This type of deception prompted the court to impose a sentence enhancement for obstruction of justice, and supports our conclusion that Phillip has not accepted responsibility for causing the child's death. In our view, Phillip has displayed none of the signs of acceptance of responsibility listed in the Sentencing Guidelines. *See* U.S.S.G. § 3E1.1, comment. (n. 1).

Phillip, noting that he did everything possible to save the child's life after Jamal "fell" down the stairs, urges us to interpret his response as a sign of sincere contrition. It appears more likely, however, that in deciding to take Jamal to the hospital, Phillip may merely have come to the quick realization that a dead four-year-old is even harder to explain away than a seriously battered four-year-old.

Accordingly, we hold that the district court's fact-finding that Phillip failed to accept responsibility for his crimes is not clearly erroneous.

#### 2.

### Upward Departure

Phillip's guideline offense level of 37 and criminal history category of I correspond to

---

**5.** Specifically, section 508.110(1) provides in part:

(1) A person is guilty of criminal abuse in the second degree when he wantonly abuses another person or permits another person of whom he has actual custody to be abused and thereby:
(a) Causes serious physical injury; or
(b) Places him in a situation that may cause him serious physical injury; or

(c) Causes torture, cruel confinement or cruel punishment;
To a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

**6.** To be precise, section 508.100(1), first-degree criminal abuse, contains the same language as section 508.110(1), second-degree criminal abuse, except for the substitution of the word "intentionally" for the word "wantonly."

a sentence range of 210–262 months of imprisonment. In imposing a sentence of 30 years of imprisonment, the district court departed upward by 98 months, or 3 offense levels, from the maximum sentence of 262 months. Phillip claims that the district court erred in making this departure.

We have recognized that the district court retains "the discretion to depart from the guidelines ... if the judge finds an aggravating or mitigating factor present that the Commission did not adequately consider when formulating the guidelines." *United States v. Perez*, 871 F.2d 45, 47 (6th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *cf.* 18 U.S.C. §§ 3551, 3553(b); U.S.S.G. § 1B1.1 *et seq.* This court is committed to a three-step analysis in reviewing such departures. *United States v. Joan*, 883 F.2d 491, 494–96 (6th Cir.1989).

### a.

### Step One

█ "The first step is a question of law regarding whether the circumstances of the case are sufficiently *unusual* to justify departure." *Id.* at 494 (emphasis added).

The Sentencing Guidelines provide in part:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. § 5K2.8, p.s.

Here, the district court explained in detail its decision to depart upward from the sentencing guidelines range:

> [T]here are factors in this case which justify a departure.... I don't believe the Sentencing Commission under any circumstances could have taken into account a scenario like or similar or even approaching that which was presented to the jury in this case. The defendant's own expert witness testified that this was the worst case of child abuse he had

ever seen. Dr. Nichols echoed that. I recall that the defendant's witness offered a gratuitous comment that he regretted that the death penalty was not available in cases like this.

> I cannot accept the argument that this defendant does not pose a danger to anyone else. I recall the testimony at the trial was that on the very evening that Jamal met his death, the defendant had gone upstairs, to use his word, to discipline the other two children with the belt about which we heard a great deal of testimony.

> In short, this child for a period of six or seven weeks was subjected to the most *savage and brutal abuse* I think that anyone within the sound of my voice has ever encountered. I don't know how his buttocks got those wounds. I accept the testimony of Dr. Nichols that they were burns. Whether they were caustic or whether they were thermal burns, I'm not prepared to say because I am certainly no physician, nor do I know how they got there. But I do know that they were not accidental.

> . . . .

> Section 5K2.8 of the guidelines, which addresses extreme conduct, provides that if the defendant's conduct was unusually heinous, cruel, brutal or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct cited in this section include torture of the victim, gratuitous infliction of injury or prolonging of pain or humiliation.

> The facts in this case indicate that for the period of time the victim resided with the defendant, he was subjected to extreme criminal abuse as has been detailed in the presentence report.

> Accordingly, a total sentence of 30 years imprisonment, which represents an upward departure of 98 months, is considered appropriate.

(Emphasis added.)

We conclude that the district court correctly applied section 5K2.8 in determining

that these circumstances are sufficiently unusual to justify departure.

b.

## Step Two

■ "Step two involves a determination as to whether there is an *actual factual basis* justifying the departure. [T]he standard is whether the determination made involves clear error." *Joan*, 883 F.2d at 494 (emphasis added); *see also United States v. Hays*, 899 F.2d 515, 519 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990). In this instance, both Gail Phillip's testimony and the coroner's report documented prolonged brutal mistreatment of Jamal over a period of many weeks. Accordingly, we hold that the district court's finding of unusually cruel and heinous treatment of the victim is not clearly erroneous.

c.

## Step Three

■ The third step involves measuring the degree of departure by a standard of reasonableness. *Joan*, 883 F.2d at 495–96. "[T]he trial judge's determination must be given great deference.... Trial judges are on the front line ... and are in a far better position ... to determine the circumstances justifying an upward departure." *Id.; see also Christoph*, 904 F.2d at 1042.

Only highly unusual circumstances can justify an upward departure equivalent to three offense levels. However, in view of the cruelty which Phillip inflicted upon his four-year-old son, we conclude that the district court did not overstep the bounds of reasonableness in imposing a three-level upward departure on the basis of the factors enumerated in U.S.S.G. § 5K2.8, p.s.

## III.

For the foregoing reasons, Phillip's convictions and sentence are AFFIRMED.

MERRITT, Chief Judge, dissenting.

I disagree with my colleagues on two points in the court's opinion: the disclosure of the videotape of the interview with young Roderick in section II.D and the upward departure in sentencing in section II.F2.

### Discovery of the Videotape

I am concerned that the defendant did not strike his son Jamal on the occasion that led to his death. If the defendant did not strike him at the top of the basement stairs, causing Jamal to fall down the steps, then the defendant is not guilty of murder in the second degree under the prosecution's theory of the case, the theory which the jury accepted in reaching its verdict.

If the jury had heard the live testimony of Roderick, and if it were the same as his initial videotaped testimony, the jury might well have believed it and rendered a verdict of not guilty on this charge. In the videotape, Roderick said that he was at the top of the basement steps watching Jamal come up when Jamal "fell down the steps." He testified that the defendant did not strike his brother at the top of the steps, causing the fatal fall.

Roderick was therefore a key witness, potentially the only person who saw whether the defendant struck Jamal so as to knock him down the steps. Thus, I regard Roderick's testimony as important. The government's investigators apparently also regarded this testimony as important for they immediately conducted a long videotaped interview using a child psychologist. But the interview was unsatisfactory from the government's point of view. The government wrongfully refused to reveal it in the face of a *Brady* and Rule 16 discovery motion. There seems little doubt that the government deliberately concealed the interview with the only other person who saw what happened at the top of the steps.

The defendant was incarcerated immediately after his arrest and did not know of Roderick's potentially exculpatory testimony. He never had access to this videotape,

nor was he ever aware of the videotape's existence until shortly before his trial. Later, during trial, the trial court refused access. By that time Roderick was living at a distant location with relatives who were hostile toward the defendant.

The ABA Code of Professional Responsibility, Disciplinary Rule 7–103(B) (1976) requires that "a public prosecutor" make disclosure of evidence that "tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." The government prosecutor clearly violated this ethical rule. Federal Rule of Criminal Procedure 16(c) also provides for discovery of "photographs ... which are material to the preparation of the defendant's defense." The defendant moved to discover such material before trial, but the government concealed the videotape. It seems clear that the videotape falls within the language of the Rule. Likewise under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government must disclose "evidence in its possession that is both favorable to the accused and material to guilt or punishment." *See also Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). The defendant moved for disclosure of such exculpatory evidence under *Brady*, but the government did not disclose the videotape. Although not itself admissible, this videotape provided evidence that is, at the least, clearly relevant and material to defendant's preparation of his defense.

The standard of review applicable to our determination of *Brady* requests is whether the suppression of evidence, if exculpatory, creates a reasonable doubt that does not otherwise exist. *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). The Supreme Court has held that "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* 480 U.S. at 57, 107 S.Ct. at 1001, *citing United States v. Bagley*, 473 U.S. 667, 682,

105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). This does not mean, then, that the defendant must show that the suppressed evidence probably would have resulted in an acquittal. Instead, disclosure and release of this evidence is required when such doubts exist. Failure to disclose is constitutional error. The error is harmless only if we can say beyond a reasonable doubt that the concealed evidence could not have affected the outcome of the trial. Here the evidence raises a serious question about whether the defendant knocked Jamal down the steps. The fact that the defendant was an exceedingly cruel and abusive father does not prove that he killed his son by knocking him down the steps. Our court and the trial court fail to maintain a distinction between these two facts.

Contrary to our court's holding in this case, the Supreme Court has not limited *Brady* evidence to that which is itself directly admissible but, rather, to that evidence that is material to "the preparation or presentation of the defendant's case," considered in light of "the totality of the circumstances." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. Discovery in criminal cases, although more limited in its scope than in civil suits, serves the essential purpose of enhancing the search for truth by allowing both parties access to critical information. Note, *Prosecutorial Discovery Under Proposed Rule 16*, 85 Harv.L.Rev. 994, 1013–14 & n. 78 (1972). "If the trial is to be the occasion at which well prepared adversaries test each other's evidence and legal contentions in the best tradition of the adversary system, there can be no substitute for [criminal discovery procedures]." Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure*, 69 Yale L.J. 1149, 1193 (1960).

This process of discovery often involves several layers of information, with one part leading to another. Information initially may not be in admissible form. To prepare an adequate defense, the defendant necessarily must first use information and evidence that is not in a form which is immediately admissible. Through additional re-

search and preparation, the defendant refines this aggregate of information into evidence that may be admissible. Thus, much of the evidence clearly within *Brady's* ambit will frequently be inadmissible in its original form. To limit *Brady* disclosure only to "directly admissible" evidence is anomalous, as *"Brady* guarantees access to favourable evidence either before or during trial ... when it is difficult if not impossible to tell whether evidence is admissible or not." Capra, *Access to Exculpatory Evidence: Avoiding the Agurs Problems of Prosecutorial Discretion and Retrospective Review,* 53 *Fordham L.Rev.* 391, 399 n. 51 (1984). This restriction would necessarily mean that only a fraction of that evidence relevant to the defendant's defense will ever be subject to disclosure by the government, regardless of its materiality and the circumstances of its suppression. If only admissible evidence were subject to disclosure, a deposition given by the perpetrator or an eyewitness exonerating a defendant could be concealed by the government because it is hearsay. The *Brady* rule contemplates the disclosure of exculpatory information. It is a constitutional rule designed, like the right of confrontation, to insure that the innocent are not convicted.

The court misunderstands the current state of the law in imposing such an admissibility requirement. The Fifth and Seventh Circuits have rejected admissibility as a prerequisite for disclosure under *Brady. Sellers v. Estelle,* 651 F.2d 1074, 1077 n. 6 (5th Cir.1981) (inadmissible reports not "immaterial," as use of such reports could "produce witnesses whose testimony ... may have been admissible"); *United States v. Wigoda,* 521 F.2d 1221, 1227 (7th Cir.1975) (if witness' statements would not lead to admissible evidence, then such statements would not be material). State supreme courts have adopted similar reasoning. *See, e.g., Ex parte Watkins,* 509 So.2d 1064, 1066 (Ala.1984) ("the crucial question is the significance of the suppressed information upon the question of ... guilt or innocence" and not its admissibility); *In re Ferguson,* 5 Cal.3d 525, 96 Cal.Rptr. 594, 600, 487 P.2d 1234, 1240

(1971); *Stokes v. State,* 402 A.2d 376, 380–81 (Del.1979); and *State v. Hall,* 249 N.W.2d 843, *cert. denied,* 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977). Moreover, the three Circuits which are cited as imposing an admissibility requirement have done so where the item or document at issue, itself inadmissible as hearsay, could not have led to any other admissible evidence within the *Brady* requirements. *Cf. United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (letter in dispute was inadmissible hearsay, not capable or producing the admissible evidence); *United States v. Oxman,* 740 F.2d 1298, 1311 (3d Cir.1984) (immunity agreement not admissible as substantive evidence, but was admissible for impeachment; disclosure warranted); *United States v. Ranney,* 719 F.2d 1183, 1990 (1st Cir.1983) (hearsay statement, not calculated to produce other admissible evidence); and *United States v. Cuthbertson,* 651 F.2d 189, 195 (3d Cir.1981) (Rule 17(c) subpoena for exculpatory material held by third party, as distinct from exculpatory material held by prosecutors; such third-party material must be admissible to require its disclosure).

The rule I would derive from these cases is the rule propounded in *Stokes* by the Delaware Supreme Court: "[T]o be material under *Brady,* undisclosed evidence must be either: (a) admissible evidence; or (b) there must be a showing on the record ... that it would have, or could have led to admissible evidence." *Stokes,* 402 A.2d at 381 (citations omitted). The instant case is the only one I can find that rejects as *Brady* material evidence that falls within the second prong of this rule.

The *Brady* rule then requires this court to compare the suppressed evidence to all the other evidence in line with *Bagley's* reasoning; the reviewing court should make its totality-of-the-circumstances assessment "with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled...." *Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384. Had Roderick been called to the stand as a live witness, this

videotape would readily enable defense counsel to know precisely what Roderick had said and, also, most importantly, to find out about a potential weakness in the government's case. Had Roderick been called as a witness, despite the fact that he said towards the end of the videotape that his mother had prompted his testimony, Roderick's testimony could easily be regarded by the jury as creating a reasonable doubt about the government's theory of the case.

This suppression of evidence by the government thwarts a defendant's attempts to organize a coherent defense and causes his counsel to prepare his defense behind a veil of ignorance. "The principle [behind prosecutorial disclosure of evidence] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system ... suffers when any accused is treated unfairly." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197.

### Upward Sentencing Departure

The Court also disregards an error in the enhancement of defendant's second-degree murder sentence, an increase predicated solely on facts relevant to his other sentence for criminal abuse in the first degree. The District Court specifically relied upon testimony regarding the beatings and punishment administered to Jamal by the defendant in justifying a 98–month upward departure under Sentencing Guideline § 5K2.8—the same facts that constituted the factual basis for the counts and sentence of criminal abuse. When added to a base offense level of 37 and a criminal history category of I, the defendant received a thirty-year sentence for the murder count, combined with the ten years for the criminal abuse counts to be served concurrently.

Despite the clear brutality evinced by the defendant's treatment of Jamal, the imposition of an enhanced sentence for one offense from essentially the same factual predicate of a separate offense that has been already calculated into the latter sentence is not a proper basis for departure from the Guidelines. An upward adjustment based on evidence already taken into consideration has the effect of improperly accounting for the same factors twice. *United States v. Fuller,* 897 F.2d 1217, 1221–22 (1st Cir.1990). To do so amounts to cumulative punishment for one offense not intended by Congress, absent its express intent to provide for multiple punishments. *See, e.g., Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). Moreover, double-counting in applying the Guidelines is inconsistent with the intended goals of the Guidelines and also contravenes their overall policy goal of providing certainty and fairness in sentencing. *United States v. Werlinger,* 894 F.2d 1015, 1017–18 (8th Cir. 1990). This repetitious use of the same factors to sentence the defendant for one crime and then enhance his sentence on a separate count is an improper departure from the Sentencing Guidelines. *See generally United States v. Williams,* 922 F.2d 737, 739–40 (11th Cir.1991); *United States v. Fonner,* 920 F.2d 1330, 1334 (7th Cir. 1990); *United States v. Franklin,* 902 F.2d 501, 508 (7th Cir.1990); and *United States v. Hernandez–Vasquez,* 884 F.2d 1314, 1315 (9th Cir.1989).

The factors applied to considering counts 2 and 3 of the indictment relating to the criminal abuse charges were used by the District Court to judge the factual basis of cruelty, brutality and degradation considered in section 5K2.8. Thus, the District Court's allocation of sentencing enhancement based squarely on the identical conduct, for which the defendant received a sentence, amounts to double-counting. The government cannot have this evidence used "both ways."