106 F.3d 402
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dan E. HALE, Defendant-Appellant.
 No. 95-5915.
 United States Court of Appeals, Sixth Circuit.
 Jan. 28, 1997.
 
 Before: NORRIS, SUHRHEINRICH, and BATCHELDER, Circuit Judges.
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Dr. Dan E. Hale appeals from his multi-count conviction for crimes related to his Tennessee medical practice. For the reasons outlined below, we now affirm his conviction and sentence.
 
 I.
 
 2
 Defendant began practicing medicine in Morristown, Tennessee, in 1977. For many years he worked in loose association with Dr. Gene Lynch, eventually purchasing his practice in 1992, at which time Lynch became an employee of defendant's professional service corporation, Boulevard West Medical Center ("BWMC").
 
 
 3
 In the early 1990s, several insurance companies contacted the United States Postal Service to report their belief that a large-scale insurance fraud was ongoing in Kentucky and Tennessee. The Lexington, Kentucky, office of the Postal Inspection Service looked into the matter. Inspector Lanny Miller contacted insurance companies in an effort to determine the extent of the fraud and the identity of the perpetrators. Eventually, the Inspection Service focused on about forty people living near Mt. Vernon and Corbin, Kentucky.
 
 
 4
 The fraud worked simply. Participants would buy numerous hospital indemnity policies that paid a sum certain in the event of a hospital admission. They would then fake injuries, present themselves to a "sympathetic" doctor, and gain admission to a hospital, typically for a soft tissue injury. The participants then filed claims for coverage with numerous insurance companies.
 
 
 5
 After investigators developed a detailed understanding of how the fraud operated, they confronted some of the participants, thirteen of whom testified against defendant, explaining how he helped them by authorizing hospital stays. Russell Ramsey, who directed many of the participants, recalled how defendant had facilitated the enterprise. Ramsey would simply tell defendant that he had somebody who needed "doctoring." So certain was Ramsey that his charges would be admitted to the hospital that he explained in advance what they needed in the way of supplies for a stay of ten to fifteen days.
 
 
 6
 The fraud spanned several years, during which time Ramsey estimated that he orchestrated as many as 100 admissions to the Morristown hospitals. He also indicated during trial that defendant seemed to know what was going on with respect to the fraud although they did not discuss it specifically because, in Ramsey's view, "I was kind of protecting him." According to Ramsey, defendant suggested that the people he brought in for admission should "ride in wheelchairs." As further evidence of their close association, Ramsey testified that defendant once asked to borrow $200,000 to buy equipment for the office.
 
 
 7
 A primary issue at trial and on appeal involves when, and if, defendant knew of the fraud. Defendant focuses on what he sees as inconsistencies in three pretrial interviews of Ramsey by law enforcement officials. In two of them, Ramsey insisted "there was no predetermined agreement between he [sic] and the doctors." In the last interview, however, after having "had a good bit of time to reflect on his relationship with Dr. Dan Hale," Ramsey claimed that he would talk to defendant the day before he was to bring in a new "patient." Defendant would tell Ramsey how to have the patients behave: bend over in pain, use a wheelchair, and request pain medication. He also discouraged Ramsey's fondness for staging car accidents because they involved police; rather, "a bathtub was a good place to have an accident."
 
 
 8
 Other testimony that pertained to defendant's knowledge of the fraud came from Steven Taylor, who administered a hospital in Morristown. In 1990, he was warned that the hospital was being used for fraud. Testifying from a contemporaneous file memorandum, Taylor recalled that he discussed the fraud with defendant and Lynch. Defendant indicated that he was aware of it. Although the admissions stopped for a few months, they soon resumed.
 
 
 9
 While the insurance fraud investigation moved forward, the Tennessee Bureau of Investigation began looking into possible overbilling by defendant in an attempt to defraud the Medicare and Medicaid programs. Testimony during trial indicated that his goal was to see as many patients and perform as many tests as the government would pay for. To that end, he used a three-minute egg timer to pace himself, and posed special challenges to staff. During "EKG month," for instance, they would be rewarded if they exceeded the number of EKGs performed during the same month the year before.
 
 
 10
 A doctor who worked briefly for defendant was told by him that he must test patients every time they walk in the door. As a result of this policy, tests were often scheduled before the doctor even saw the patient.
 
 
 11
 In short, the testimony at trial from former employees, including doctors, nurses, and staff about unnecessary testing and dubious billing was overwhelming. Defendant does not dispute this but rather argues that an avalanche of inadmissible evidence unfairly prejudiced his defense.
 
 
 12
 Defendant was charged with numerous counts of mail fraud in violation of 18 U.S.C. § 1341, as well as criminal and civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §§ 1961-68. After a lengthy trial, a jury convicted him on all counts.
 
 II.
 1. Brady Material
 
 13
 It is well-established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. United States v. Bagley, 473 U.S. 667, 682 (1985). This does not require demonstration by a preponderance that disclosure would have resulted in an acquittal; rather, a reasonable probability of a different result is shown when the government's suppression of the favorable evidence undermines confidence in the outcome of the trial. Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995).
 
 
 14
 Because, as a practical matter, implementation of the Brady rule contemplates that the government will enjoy a measure of discretion in determining whether evidence in its possession is material, it is burdened with a corresponding duty to evaluate potential Brady material in a manner that will result in a fair trial. It is the prosecution's duty, after all, to seek a just verdict, not a conviction. See Berger v. United States, 295 U.S. 78, 88 (1935). It alone knows what evidence remains undisclosed and therefore it must be assigned the primary responsibility of gauging whether it constitutes evidence favorable to the accused and is therefore discoverable. Whitley, 115 S.Ct. at 1568.
 
 
 15
 In the case before us, counsel for defendant sought access to pretrial statements made by participants in the fraud scheme. Among the statements in the government's possession were summaries of the three interviews of Russell Ramsey. Because the government took the position that these statements were not exculpatory, defense counsel asked the trial court to inspect the statements in camera prior to cross-examination of the witness and make an independent determination whether any of the material should be provided to the defense.
 
 
 16
 After the direct examination of Russell Ramsey, the trial court reviewed the interview summaries and concluded that "the essence of most of these exculpatory matters have been hit by Mr. Ramsey." However, the court went on to mention that the summaries indicated that Ramsey lied to the doctor about the injuries of the people he brought to the hospital; that he insisted that there was no predetermined agreement between himself and defendant; and that he would tip the women in defendant's office $100 to fill in insurance forms that were later signed by defendant. Although defense counsel attempted to use the information provided by the district court to cross-examine Ramsey, he contends that the timing and nature of the disclosure compromised his ability to cross-examine the witness effectively.
 
 
 17
 This court reviews de novo the issue of whether evidence withheld by the prosecution constituted Brady material. United States v. Phillip, 948 F.2d 241, 250 (6th Cir.1991). Having had the opportunity to review the three interview summaries at length, a privilege that the government's handling of this material denied to the district court, we conclude that the memoranda contain exculpatory material that should have been disclosed to the defense prior to trial. The following statements culled from the interviews provide a non-exhaustive list of Brady material:
 
 
 18
 "Russell stood by his original claim that he went in and lied to the doctor about the injuries of the people he brought there. He insisted there was no predetermined agreement between he [sic] and the doctors."
 
 
 19
 "[Inspector] Lanny [Miller] asked Russell why he felt he needed to protect the doctors. Russell responded that he wouldn't."
 
 
 20
 "Russell was asked if he'd ever told anyone that he had an agreement with the doctors about the scheme. He stated 'no, that he'd always led everyone to believe he was in control of the situation.' "
 
 
 21
 "He said that on occasion, he would ask to be admitted to the hospital, but that he never talked to the doctors about actually faking the accidents."
 
 
 22
 "He never gave the doctors bribes--only paid the bill."
 
 
 23
 In light of these statements and others not cited, the government's contention that the interview summaries do not contain exculpatory material is patently unsupportable. Moreover, its position that Russell Ramsey's trial testimony was consistent with these statements is likewise incorrect. One instance will suffice to illustrate this point. As noted above, Ramsey stated before trial that he would not protect the doctors. That hardly can be reconciled with his assertion during trial that "I was kind of protecting him [defendant]."
 
 
 24
 The prosecution, then, was obliged to release the exculpatory portions of the interview summaries to defendant. In failing to do so, it improperly failed to carry out its duty to evaluate the exculpatory nature of the statements. Surely, the prosecution's affirmative duty under Brady to disclose evidence favorable to a defendant includes the affirmative duty to evaluate whether the evidence is favorable to a defendant; the prosecution cannot avoid the former duty by defaulting on the latter and delegating it in every instance to a trial judge. While it may be proper to seek the intervention of the trial court where the material is arguably non-exculpatory, that certainly was not the situation with these interview summaries. Here, the trial judge effectively evaluated the materials. However, since any last-minute evaluation by the trial court runs the risk of not providing the defense with an opportunity to prepare an adequate cross-examination, which in turn may compromise the overall fairness of the trial, it is all the more imperative that the government not shirk its duty to make good-faith evaluations.
 
 
 25
 Furthermore, non-disclosure of Brady material places an onerous burden on an appellate court. We must answer the question posed by Whitley: Did the absence of the exculpatory material have the cumulative effect of depriving defendant of a verdict worthy of confidence? Whitley, 115 S.Ct. at 1566-67. In the context of a lengthy trial such as the one now before us, resolution of this issue represents a difficult and time-consuming task, requiring us to review the record of the entire trial in order to determine the effect of non-disclosure.
 
 
 26
 We have done so and conclude that, although the prosecution should have provided defense counsel with interview summaries, their non-disclosure does not require reversal. The most telling exculpatory material was revealed to the defense by the trial judge, and it was of a nature that it could be effectively exploited by cross-examination if the defense cared to utilize it. Evidence of guilt, both direct and circumstantial, was overwhelming. While we disagree with the government's characterization of Russell Ramsey's testimony as "relatively minor," we do not believe that the verdict in any way hinged upon it. Furthermore, much of his testimony, which was clearly damaging to defendant, was consistent throughout. Thus, while the exculpatory material could have been used to impeach Ramsey, it would not have enabled defense counsel to negate entirely the damaging nature of his testimony. Given these considerations, our confidence in the verdict remains intact.
 
 2. Evidentiary Issues
 
 27
 Over the objection of defense counsel, the trial court permitted the government to introduce evidence that the insurance fraud was much greater than that actually charged; according to this testimony, which was admitted pursuant to Fed.R.Evid. 404(b),[1] as many as 170 individuals took part in the fraud. In its motion in limine, the government contended that this evidence was admissible on the ground that it tends to show a common scheme and to prove defendant's knowledge of the fraud:
 
 
 28
 It is beyond challenge that the Kentucky people were patients of Dr. Hale and Dr. Lynch and that the Doctors placed them in the hospital. The sole issue for jury determination is what was Dr. Hale's state of mind when he admitted these people. To borrow a phrase: "What did he know, and when did he know it?"
 
 
 29
 In this context it is easy to see that anything which imputes to Dr. Hale knowledge of the fraud, or makes his knowledge more probable, is probative and admissible.... To the extent that Dr. Hale takes the position that he could not see this forty person Kentucky scam being perpetrated through his office because it was not that large in comparison to his overall practice, then the existence of a 170 person identical scam would be admissible to refute his defense.
 
 
 30
 Defendant contended that such testimony was overly prejudicial, consisted of inadmissible hearsay, and was improper opinion testimony.
 
 
 31
 In United States v. Feinman, 930 F.2d 495 (6th Cir.1991), this court set out the following guidelines for reviewing Rule 404(b) issues:
 
 
 32
 A trial court must employ a two-step analysis in determining the admissibility of evidence offered under Fed.R.Evid. 404(b). First, the trial court must ascertain whether the proffered evidence is relevant and admissible for a proper purpose. To be relevant, the evidence must relate to a matter which is "in issue," and must deal with conduct substantially similar and reasonably near in time to the offenses for which the defendant is being tried. To determine whether the proffered evidence is admissible for a proper purpose, the trial court must decide, whether that evidence is probative of a material issue other than character.
 
 
 33
 Finally, the court must determine whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice." The district court has broad discretion in balancing probative value against potential prejudicial impact. We review a district judge's balancing of prejudicial impact and probative value under Fed.R.Evid. 404(b) under an abuse of discretion standard.
 
 
 34
 Id. at 499 (citations omitted).
 
 
 35
 Insurance investigator Tom Isbell testified about his work uncovering fraud in Tennessee, which defendant contends violates Rule 602 of the Federal Rules of Evidence: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Among other things, Isbell mentioned investigating sixty-eight suspicious claims involving soft tissue injuries. Nearly all of them were patients of either Dr. Lynch or defendant. He also described a conversation that he had with defendant in 1991 concerning suspected insurance fraud.
 
 
 36
 Inspector Lanny Miller of the Postal Service also testified regarding the "larger scam." Like Isbell, he used charts summarizing the various participants in the fraud to help illustrate his testimony. In our view, the testimony of both Isbell and Miller is admissible. Contrary to the position taken by defendant, each man discussed a subject of which he had intimate personal knowledge, to wit, his own investigation of fraud.
 
 
 37
 The testimony introduced by the government relating to the alleged abuse of the Medicare and Medicaid programs was supported in large part by administrators and investigators who testified about defendant's administrative history with the programs.
 
 
 38
 According to witness Yvonne Wood, who investigated fraud in the Medicaid program, the Medicaid Bureau could track suspected "over utilization" by comparing doctors. When it determined that a claimed procedure was not medically necessary, it would send the doctor a "recoupment" letter. She indicated that defendant had received such letters, which she characterized as a relatively rare event.
 
 
 39
 Another witness, Kay Hogan, indicated that defendant fell statistically into the "top 1%" of doctors with the most aberrant history of Medicare claims. Similar testimony culled from investigations and statistical models was admitted from other witnesses as well.
 
 
 40
 Defendant argues that all of this testimony was improper, at least in part, as "scientific" evidence introduced by lay witnesses and it violated the rule against hearsay. He also contends that it was overly prejudicial.
 
 
 41
 However, at trial defense counsel did not object to either lay witness testimony or to hearsay. Consequently, we review for plain error. Fed.R.Crim.P. 52(b). Neither issue remotely approaches the level of plain error required for reversal. See United States v. Olano, 507 U.S. 725 (1993) (explaining the application of Rule 52(b)).
 
 
 42
 Under Feinman, the trial court retains broad discretion when balancing the potential prejudice of proffered testimony against its probative value. 930 F.2d at 499. In this case, the fact that the primary defense theory was based upon defendant's alleged ignorance of the fraud convinces us that the district court did not abuse its discretion in ruling that the evidence relating to both the abuse of the Medicare and Medicaid programs and the actual extent of the insurance fraud were relevant and not unfairly prejudicial.
 
 3. Use of Grand Jury Testimony
 
 43
 This circuit has held that as a general rule testimony given by a grand jury witness suspected of wrongdoing may be used against him in a later prosecution for a substantive criminal offense. United States v. Slone, 833 F.2d 595, 601 (6th Cir.1987). Such statements are not considered hearsay. Id. (citing Fed.R.Evid. 801(d)(2)).
 
 
 44
 Nonetheless, defendant contends that Slone does not permit introduction of lengthy questions posed to him during grand jury proceedings because they represent statements made by the prosecutor, not by the defendant. We find no support for this position. Rather, the questions were necessary to put defendant's responses in context and their introduction during trial was proper.
 
 4. RICO Pattern Requirement
 
 45
 RICO requires a pattern of racketeering activity, defined as
 
 
 46
 at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity.
 
 
 47
 18 U.S.C. § 1961(5). The Supreme Court requires the criminal conduct to be connected and related:
 
 
 48
 In normal usage, the word "pattern" here would be taken to require more than just a multiplicity of racketeering predicates. A "pattern" is an "arrangement or order of things or activity," and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them "ordered" or "arranged."
 
 
 49
 ....
 
 
 50
 RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.
 
 
 51
 ....
 
 
 52
 What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, simpliciter. This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity.
 
 
 53
 H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238-41 (1989) (citation omitted). Defendant focuses on the "relatedness" requirement, citing Vild v. Visconsi, 956 F.2d 560 (6th Cir.1992), for the proposition that two separate schemes do not qualify. The Vild court looked to H.J., noting that "[t]he plaintiff may satisfy the relationship requirement if the predicate acts alleged 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " Id. at 566 (citing H.J.).
 
 
 54
 Even if we assume arguendo that the alleged Medicare and Medicaid abuse was unrelated to the Kentucky insurance fraud, there were many related predicate acts involved in the insurance fraud alone. See Dana Corp. v. Blue Cross & Blue Shield, 900 F.2d 882, 886-87 (6th Cir.1990) (single scheme containing repetitive illegal conduct satisfies relatedness requirement). This is enough to satisfy the RICO relatedness requirement.
 
 5. Jury Instruction
 
 55
 Finally, defendant argues that the district court erred in giving a jury instruction that included the language "a scheme to deprive another ... of the intangible right to honest services by false or fraudulent pretenses, representations, or promises."
 
 
 56
 Prior to November 18, 1988, such a charge was impermissible. McNally v. United States, 483 U.S. 350 (1987). In an attempt to address this situation, Congress enacted 18 U.S.C. § 1346, which reads: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." This statute is not retroactive. United States v. Davis, 873 F.2d 900, 902 (6th Cir.1989). Thus, defendant argues that the district court improperly allowed the jury to consider a theory of criminal liability that was invalid when some of his criminal conduct occurred.
 
 
 57
 The government concedes that the "honest services" portion of the instruction was given in error with respect to the wrongful activity committed by defendant before November 1988. Because it did not premise its case upon an "honest services" theory, but rather upon the old-fashioned motive of financial gain, the government argues that the error does not require reversal.
 
 
 58
 Defense counsel neglected to object to the instruction and we therefore review it for plain error. Fed.R.Crim.P. 52(b). Taken in the context of the prosecution's theory of guilt, we conclude that defendant has not, as he is required to do, made a "specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." See United States v. Olano, 507 U.S. at 735 (1993).
 
 III.
 
 59
 For the foregoing reasons, the conviction and sentence of defendant are affirmed.
 
 
 
 [1]
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case, shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed.R.Evid. 404(b)